UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| GETTY PETROLEUM MARKETING, INC., and GREEN VALLEY OIL, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | Civil Action No. |
| v. | ) ) | 11-40003-FDS |
| 2211 REALTY, LLC; JAMES J. GRASSECHI; and EDWARD F. MARTIN, | ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION TO DISMISS
COUNTS ONE THROUGH SIX OF THE COUNTERCLAIM**

**SAYLOR, J.**

This is a lawsuit arising out of the termination of a dealer agreement for a gas station in Warwick, Rhode Island. The case was brought by Getty Petroleum Marketing, Inc., and Green Valley Oil, LLC, against 2211 Realty, LLC, and its two members, James J. Grassechi and Edward F. Martin. On July 1, 2011, defendants filed a counterclaim against plaintiffs alleging breach of contract, breach of the implied covenant of good faith and fair dealing, tortious interference with business relations, trespass, violation of R.I.G.L. § 9-1-2, violation of R.I.G.L. § 5-55-4, defamation, slander *per se*, and unjust enrichment. Plaintiffs have filed a motion to dismiss Counts 1 through 6 of the counterclaim for failing to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6). For the reasons set forth below, the motion will be granted in part and denied in part.

**I.   Factual Background**

The following factual allegations are drawn from the counterclaim and the attached

exhibits.

### A.      Performance under the Contact

Getty Petroleum Marketing, Inc., is a Maryland corporation with a principal place of business in East Meadow, New York.  (Countercl. ¶ 11).  Green Valley Oil, LLC, is a Pennsylvania limited liability company.  (*Id.* at ¶ 8-9).  Defendant Martin resides in Douglas, Massachusetts, and Defendant Grassechi resides in Hubbardston, Massachusetts.  (*Id.* at ¶ 5-6).  2211 Realty LLC, is a Rhode Island limited liability company, with Martin and Grassechi as its only members.  (*Id.* at ¶ 1, 4).

On September 1, 2007, Getty and 2211 Realty entered into various agreements, including a Dealer Commission Contract (the "Contract"), for a gasoline service station located in Warwick, Rhode Island.  (*Id.* at ¶ 14).[1]  The Dealer Commission Contract was a nine-year contract, pursuant to which Getty would supply 2211 Realty with petroleum products under the Lukoil brand name.  (*Id.* at ¶ 16-17).  2211 Realty also signed a mortgage that secured its obligations to Getty with the property as collateral.  (*Id.* at ¶ 20, Ex. B).  According to their terms, the Contract and the mortgage are governed by Rhode Island law.  (*Id.* at ¶¶ 19, 22).  Martin and Grassechi signed a guaranty, guaranteeing any indebtedness 2211 Realty may incur against Getty and its subsidiaries and affiliated companies.  (*Id.* at ¶ 23, Ex. C).

On March 15, 2010, without notice to defendants, Getty assigned its agreements with 2211 Realty to Green Valley.  (*Id.* at ¶ 26, 28).  Defendants allege that Getty did so after Green Valley entered into an agreement with BP in 2009 to rebrand approximately 235 of its New England gas stations from Lukoil to BP.  (*Id.* at ¶ 24).  On April 1, 2010, representatives of

---

[1] Other agreements included an Equipment Loan Agreement, an Equipment Schedule, a Sign and Pole Agreement, a Credit Card Lease and Equipment Agreement, an Amortization Agreement, a Rider to Dealer Supply/Commission Contract, a Point of Sale Agreement, and a Corporate Dealer Rider.  (*See* Countercl. Ex. A).

Green Valley met with Grasseschi and represented that Green Valley was the assignee of the agreements between 2211 Realty and Getty. (*Id.* at ¶ 27). Thereafter, Edward Janoski and Bob Burrell, both representatives of Green Valley, tried to persuade 2211 Realty to enter into a new "Rack Plus" agreement, intended to replace the Dealer Commission Agreement. (*Id.* at ¶ 31). Defendants allege that the Dealer Commission Agreement was costing Green Valley $20,000 to $30,000 per month, and that the Rack Plus agreement would have reduced the amount Green Valley had to pay 2211 Realty. (*Id.* at ¶¶ 32-36). Green Valley also informed 2211 Realty that it intended to rebrand the gas station from Lukoil to BP. (*Id.* at ¶ 38). 2211 Realty refused to terminate the Contract, and objected to Green Valley's decision to rebrand to BP. (*Id.* at ¶¶ 37-38).

In July 2010, Green Valley significantly reduced its deliveries of gasoline to 2211 Realty. On July 28, 2010, it sent 2211 Realty a "Notice to Cure Default" alleging that 2211 Realty was in default of the Contract for failing to pay for fuel deliveries on May 20 and June 26, 2010. (*Id.* at ¶ 42-43, Ex. E). 2211 Realty immediately responded, denying the allegations and requesting that the Notice to Cure be rescinded and that Green Valley resume fuel delivery. (*Id.* at 44, Ex. F). Green Valley did not resume deliveries, and as a result, 2211 Realty closed the gas station on July 30, 2010. (*Id.* at 45). Defendants allege that because the gas station closed abruptly, they lost customers and substantial income and suffered damage to their reputation. (*Id.* at ¶ 53).

On August 26, 2010, Green Valley sent 2211 Realty a "Notice of Termination and Demand for Payment," which again claimed that it was in breach of the Contract, and advised that the Contract would be terminated as of September 3, 2010. (*Id.* at ¶ 49, Ex. I). 2211 Realty responded, again denying the allegations, and stating that Green Valley's conduct was causing it

significant harm. (*Id.* at ¶ 50, Ex. J). On January 2, 2011, Getty sent 2211 Realty a "Demand for Payment," which alleged that 2211 Realty was in default of its obligations under the Amortization Agreement, and that the agreement would be terminated in five days from the date of the demand letter. (*Id.* at ¶ 52, Ex. K; *see also id.*, Ex. A, at 12; Compl. Ex. D).

### B. Green Valley Representatives Enter 2211 Realty's Premises

Under the Contract, 2211 Realty was required to permit Getty upon request to inspect its books and records and to enter the property for various purposes. (*Id.* at ¶ 72-73, Ex. 1). Specifically, the contract provided:

> 21  Dealer shall permit Company, by its representatives or agents, to enter onto the Station at any time to Inspect the Station, to obtain samples of gasoline and other products, and to take pump and gasoline stick readings.
>
> * * *
>
> 26  Dealer shall provide information daily of the number of gallons of gasoline and other product sales, including the total dollar amount. Dealer shall permit Company to inspect Dealer's books and records relating to such sales, and shall provide such other information as the Company from time to time shall request, as in its judgment, it shall deem necessary.
>
> 27  Dealer shall maintain accurate daily inventory records for all products and notify Company of any unusual inventory discrepancies. Dealer shall provide copies of such records to Company upon request. Company shall not be responsible for any loss, leakage or shrinkage of petroleum products at the Station through or from any tank or other equipment. Furthermore, if Dealer fails to maintain accurate daily inventory records or to notify Company of any discrepancies and Company is required to test the underground storage tanks and/or other equipment at the Station, Dealer shall be responsible for any and all costs, associated with such required testing.

(Countercl. Ex. A).

On the morning of July 20, 2010, Burrell called Martin and asked if Martin was going to be at the gas station that morning. (Countercl. at ¶ 70). Martin replied that he would be in

Worcester. (*Id.*). Sometime later, one of 2211 Realty's employees informed Martin that Burrell and representatives of SJP Enterprises, Inc. (a subcontractor that delivers gasoline for Green Valley) and Tyree Environmental Corp. were at the station. (*Id.* at ¶¶ 62, 71). Martin called Burrell and asked him to leave, but Burrell refused. (*Id.* at ¶ 76). While on the property, the Green Valley representatives did not conduct a field audit or ask to inspect any books or records. (*Id.* at ¶ 75).

Martin then went to the station. When he arrived, he saw a Green Valley representative running from his office. (*Id.* at ¶ 77). Martin noticed that the Veeder-Root system—a system that monitors the level of gasoline in the underground storage tanks—was dismantled and attached to a Green Valley computer. (*Id.* at ¶ 60, 78).[2] He also noticed that the date on the Veeder-Root had been changed. (*Id.* at ¶ 78).[3] He then ordered the Green Valley representatives off the property. (*Id.*). After inspecting his office, he noticed that several boxes of credit card receipts were missing. (*Id.* at ¶ 79).

## II.    Procedural Background

This action was filed on January 5, 2011. On July 1, 2011, defendants answered the complaint and filed a counterclaim. The counterclaim asserts nine counts: (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) tortious interference with business relations, (4) trespass, (5) violation of Rhode Island Gen. Laws § 9-1-2, (6) violation of Rhode Island Gen. Laws § 5-55-4, (7) defamation, (8) slander *per se*, and (9)

---

[2] The Veeder-Root system also monitors tanks for leakage. It only holds data for the previous ten loads of gasoline. (*Id.* at ¶ 69). Generally, a reading will be taken from the Veeder-Root prior to delivery and again after delivery. (*Id.* at ¶ 60). At all times relevant to this litigation, 2211 Realty owned and maintained a Veeder-Root TLS 350 system. (*Id.* at ¶ 68).

[3] The Veeder-Root allows manual changes to the measurement readings in the system. (*Id.* at 69).

unjust enrichment.  Plaintiffs have moved to dismiss Counts 1 through 6 of the counterclaim.

On December 5, 2011, Getty filed for bankruptcy, and the case was stayed as to any claims against Getty on December 13, 2011.  *See* 11 U.S.C. § 362.  Because "a counterclaim is 'an action or proceeding against the debtor,' § 362(a)(1), relief from the stay must be sought" before this Court can address those counterclaims.  *In re Merrick*, 175 B.R. 333, 337 (B.A.P. 9th Cir. 1994).  Defendants have not requested relief from the stay, thus this Court will not consider the counterclaims against Getty.  *See Austin v. Unarco Industries, Inc.*, 705 F.2d 1, 4 (1st Cir. 1983) ("[T]he automatic stay provisions of 11 U.S.C. § 362(a) apply only to the bankrupt debtor.").[4]

Getty has filed for bankruptcy, and thus all claims against it are stayed.  *See* 11 U.S.C. § 362(a)(1).  Accordingly, the Court will not address the motion to dismiss the counterclaims as to Getty.

---

[4] The Court notes that the policy behind the stay "is to protect the [debtor's] estate from being eaten away by creditors' lawsuits and seizures," thus, "the automatic stay is inapplicable to suits *by* the [debtor]." *Martin-Trigona v. Champion Fed. Sav. & Loan Ass'n.*, 892 F.2d 575, 577 (7th Cir. 1989) (emphasis in original); *see also In re Nelson*, 994 F.2d 42, 44 (1st Cir. 1993); *Rivera Colon v. Padilla Ferrer*, 2003 WL 21692003, at *1 n.1 (D.P.R. July 14, 2003).  As a result, "[t]he trustee or debtor in possession is not prevented by the automatic stay from prosecuting or appearing in an action which the debtor has initiated and that is pending at time of bankruptcy," *In re White*, 186 B.R. 700, 704, 706-07 (B.A.P. 9th Cir. 1995) (citing *In re Merrick*, 175 B.R. at 337), and persons whom the debtor has sued are not prevented by the stay from protecting their legal rights. *Martin-Trigona*, 892 F.2d at 577; *In re White*, 186 B.R. at 704, 706-07.  To the extent that counterclaims are essentially defenses to the debtor's claims, "when the debtor is in the position of the assailant, it would be inequitable to invoke the stay against the defendant[s'] counterclaim . . . ." *In re Anchev*, 2009 Bankr. LEXIS 906, at *7 (Bankr. S.D.N.Y. Apr. 15, 2009) (quoting *In re Jandous Electric Construction Corp.*, 106 B.R. 48, 50 (Bankr. S.D.N.Y. 1989)); *accord Bohack Corp. v. Borden, Inc.*, 599 F.2d 1160, 1168 (2d Cir. 1979); *see also ACandS, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d 252, 259 (3d Cir. 2006) ("Defenses, as opposed to counter-claims, do not violate the automatic stay because the stay does not seek to prevent defendants sued by a debtor from defending their legal rights and 'the defendant in the bankrupt's suit is not, by opposing that suit, seeking to take possession of it . . . .'" (citation omitted)).

Since filing its Suggestion of Bankruptcy with this Court, there has been no appearance of counsel representing Getty or the trustee of Getty's estate, and there has been no other indication that Getty (or its estate) is pursuing its claims against defendants.  Therefore, the Court need not determine at this point whether relief from the stay will be necessary for defendants to pursue their counterclaims should Getty choose to prosecute its claims while the stay is in effect.

## III.  Standard of Review

On a motion to dismiss, the Court "must assume the truth of all well-plead[ed] facts and give plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)).  To survive a motion to dismiss, the plaintiff must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 556).  Dismissal is appropriate if plaintiff's well-pleaded facts do not "possess enough heft to show that plaintiff is entitled to relief." *Ruiz Rivera v. Pfizer Pharm., LLC*, 521 F.3d 76, 84 (1st Cir. 2008) (quotations and original alterations omitted).

## IV.  Analysis

### A.  Breach of Contract (Count 1)

Plaintiffs do not dispute that the counterclaim states a claim for breach of contract as to Green Valley.[5]

### B.  Implied Covenant of Good Faith and Fair Dealing (Count 2)

Green Valley contends that the complaint fails to state a claim for a breach of the implied covenant of good faith and fair dealing.  "Under Rhode Island law there is an 'implied covenant

---

[5] The parties agree that Grassechi and Martin, in their individual capacity, have not alleged claims in Counts 1 and 2 for breach of contract or for breach of the implied covenant of good faith and fair dealing, as they were not parties to the contract.

7

of good faith and fair dealing between parties to a contract so that contractual objectives may be achieved.'" *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 66 F. Supp. 2d 317, 329 (D.R.I. 1999) (citation omitted); *Dovenmuehle Mortgage, Inc. v. Antonelli*, 790 A.2d 1113, 1115 (R.I. 2002); *Ide Farm & Stable, Inc. v. Cardi*, 297 A.2d 643, 645 (R.I. 1972). "[A] breach of the duty of good faith and fair dealing gives rise only to a breach of contract claim, not to a tortious cause of action." *Ross-Simons of Warwick*, 66 F. Supp. 2d at 329 (citing *A.A.A. Pool Service v. Aetna Cas. & Sur. Co.*, 121 R.I. 96, 98, 395 A.2d 724 (1978)). "The applicable standard in determining whether the implied covenant of good faith and fair dealing has been breached is 'whether or not the actions in question are free from arbitrary or unreasonable conduct.'" *Town of Narragansett v. Palmisciano*, 2006 WL 3290846, at *5 (R.I. Super. Nov. 6, 2006) (quoting *Ross-Simons of Warwick*, 66 F.Supp.2d at 329).

Here, 2211 Realty contends that Getty assigned the contract to Green Valley *because* Green Valley had no interest in maintaining the existing contractual relationship; it further contends that Getty and Green Valley hoped to avoid their contractual obligations and to pressure 2211 Realty into entering into a less favorable contract. Specifically, 2211 Realty alleges that Getty assigned the contract after Green Valley had entered an agreement to rebrand many of its gas stations, including those operated by 2211 Realty, from Lukoil to BP. After the assignment, Green Valley then began pressuring 2211 Realty to enter into a less profitable contract and to rebrand its stations. Ultimately, 2211 Realty alleges that Green Valley sent representatives to break into Martin's office and steal documents to make it appear as though 2211 Realty breached the contract. Such conduct, if proved, would almost certainly be unreasonable and inconsistent with the purposes of the contract. *See Psaty & Fuhrman, Inc. v.*

*Housing Auth.*, 68 A.2d 32, 36 (R.I. 1949) (stating parties can be "deprived of the benefit [of the contract]" if their "conduct indicates bad faith or some other tortious intent"); *Thompson Trading, Ltd. v. Allied Breweries Overseas Trading, Ltd.*, 748 F. Supp. 936, 941-42 (D.R.I. 1990). Such allegations are sufficient to state a claim for breach of the implied covenant of good faith and fair dealing, and the motion to dismiss as to Count 2 will therefore be denied.[6]

### C.     Tortious Interference with Business Relations (Count 3)

The counterclaim alleges that Green Valley engaged in affirmative acts that interfered with defendants' relationship with their customers. To bring a claim for tortious interference with business relations, defendants must allege "(1) the existence of a business relationship or expectancy, (2) knowledge by the interferor of the relationship or expectancy, (3) an intentional act of interference, (4) proof that the interference caused the harm sustained, and (5) damages to the plaintiff." *L.A. Ray Realty v. Town Council*, 698 A.2d 202, 207 (R.I. 1997) (quoting *Mesolella v. City of Providence*, 508 A.2d 661, 669 (R.I. 1986)).

To be actionable, there must be "an 'intentional and improper' act of interference, not merely an intentional act of interference." *Avila v. Newport Grand Jai Alai LLC*, 935 A.2d 91, 98 (R.I. 2007); *C.N.C. Chemical Corp. v. Pennwalt Corp.*, 690 F. Supp. 139, 142 (D.R.I. 1988) (citing *Federal Auto Body Works v. Aetna Casualty & Surety Co.*, 447 A.2d 377, 379-80 (R.I. 1982)).[7] "Malice, in the sense of spite or ill will, is not required; rather legal malice—an intent

---

[6] Of course, if Green Valley can show that its actions were based on legitimate business considerations or it was not acting in "bad faith or [with] some other tortious intent" there may be no breach of the implied covenant, even if it breached the contract or its actions are otherwise actionable in tort. *See Psaty & Fuhrman, Inc*, 68 A.2d at 36; *Ross-Simons of Warwick*, 66 F. Supp. 2d at 330; *Landry v. Farmer*, 564 F. Supp. 598, 611 (D.R.I. 1983).

[7] Whether interference is improper depends upon the facts in a particular situation, the court may consider, among other things, "(1) the nature of the actor's conduct; (2) the actor's motive; (3) the contractual interest with which the conduct interferes; (4) the interests sought to be advanced by the actor; (5) the balance of the social interests in protecting freedom of action of the actor and the contractual freedom of the putative plaintiff; (6) the proximity of the actor's conduct to the interference complained of; and (7) the parties' relationship." *Avila*, 935

to do harm without justification—will suffice." *Mesolella*, 508 A.2d at 669-670.  Therefore, to establish a *prima facie* case, defendants "must allege . . . not only that the putative tortfeasors intended to do harm to the contract [or business relationship] but that they did so without the benefit of any legally recognized privilege or other justification.  Upon such a showing, the alleged offenders would then have the opportunity—and the burden—to prove that the . . . interference was indeed justified." *Belliveau Bldg. Corp. v. O'Coin*, 763 A.2d 622, 627 (R.I. 2000)

Here, defendants contend in essence that Green Valley intentionally reduced and terminated gasoline deliveries to interfere with their relationship with their customers and cause them financial harm.  Green Valley contends that the intentional interference claim must fail because that claim does not allege (1) that it knew *the identities* of defendants' customers, or (2) that it *induced* defendants' customers to end their business relationship.  However, it is sufficient for these purposes to allege that Green Valley knew of defendants' relationship with their customers and that its actions prevented those customers from continuing the business relationship.  *See L.A. Ray Realty*, 698 A.2d at 207; *Mesolella*, 508 A.2d at 669; RESTATEMENT (SECOND) OF TORTS § 766B cmt c. ("Also included [in the tort] is interference with a continuing business or other customary relationship not amounting to a formal contract.").

The counterclaim alleges that Getty and Green Valley knew that Grassechi and Martin were owners of 2211 Realty, and that they had entered into contracts with Getty whereby Getty would provide gasoline that defendants would sell.  Despite this knowledge, after Getty assigned the contract to Green Valley, Green Valley reduced and ultimately stopped delivering gasoline to

---

A.2d at 98 (quoting *Belliveau Building Corp. v. O'Coin*, 763 A.2d 622, 628 n.3 (R.I. 2000)); *see also Thompson Trading, Ltd. v. Allied Breweries Overseas Trading, Ltd.*, 748 F. Supp. 936, 944-945 (D.R.I. 1990) ("[T]he invocation of a contractual right, if found in fact to be unreasonable, can also constitute improper interference.").

defendants. As a result, defendants did not have enough gasoline to meet its customers' demand and had to abruptly close the gas station, losing customers and money and suffering damage to their reputation. Although these factual allegations are not as detailed or specific as they could be, reading the counterclaim in the light most favorable to defendants, it may be reasonably inferred that Green Valley took these actions to interfere with defendants' customer relationships in order to pressure them to alter their contractual arrangement. *See Iqbal*, 129 S.Ct. at 1949 (citing *Twombly*, 550 U.S. at 556); *Thompson Trading, Ltd.*, 748 F. Supp. at 944-945 ("Although the means employed [to assign the contract] appear innocent, the alleged resulting interference may still be improper.").[8]

Of course, it is possible that Green Valley acted pursuant to legitimate business considerations and did not intend to harm defendants' business relationship with their customers, or that its actions were otherwise legally justified. *See Belliveau Bldg. Corp.*, 763 A.2d at 628-629. Such issues, however, cannot be decided on a motion to dismiss. *See Thompson Trading, Ltd.*, 748 F. Supp. at 944-945; *C.N.C. Chemical Corp.*, 690 F. Supp. at 143 (stating that initiating lawsuit "without probable cause and for the purpose of interfering with . . . contractual relations" could constitute improper interference).

Accordingly, the motion to dismiss as to Count 3 will be denied.

### D. Trespass to Land (Count 4)

The counterclaim also alleges that Green Valley is liable for trespass. "In Rhode Island, a party claiming trespass must show: '(1) the adverse party intentionally entered onto the

---

[8] Although the causal chain between Green Valley's actions and the interference with defendants' business relations is somewhat attenuated, to prove causation in this context defendants need only show "either that but for the interference there would have been a relationship or that it is reasonably probable that but for the interference the relationship would have been established." *L.A. Ray Realty*, 698 A.2d at 207.

owner's property; and (2) plaintiff had rightful possession of such property.'" *Goat Island S. Condo. Ass'n v. IDC Clambakes, Inc.*, 382 B.R. 178, 179 (D.R.I. 2008) (quoting *Smith v. Hart*, 2005 WL 374350, at *5 (R.I. Super. Mar. 1, 2005)); *see also State v. Verrecchia*, 766 A.2d 377, 382-83 (R.I. 2001). "One who has consent or privilege and enters on to another's property is not a trespasser." *Smith*, 2005 WL 374350, at *5 (citing *Ferreira v. Strack*, 652 A.2d 965, 969 (R.I. 1995)).

According to the counterclaim, defendants had rightful possession of the property, and agents of Green Valley entered the property. Green Valley contends that under the Contract, it was legally entitled to enter. As noted, the Contract required 2211 Realty to "permit the Company, by its representatives or agents, to enter on the Station at any time to inspect the Station," and "permit the Company to inspect [2211 Realty's] books and records relating to [product sales]." (Contercl. Ex. A, ¶ 21, 26). In addition, under the Contract, 2211 Realty was required to "provide copies of [daily inventory] records to Company upon request." (Contercl. Ex. A, ¶ 27).

The counterclaim alleges that representatives of Green Valley, without the permission, authorization, or knowledge of defendants, entered Martin's office at the property owned by 2211 Realty. (Countercl. ¶ 74). While on the property, the representatives did not conduct a field audit, and did not ask to inspect defendants' books or records. (*Id.* at ¶ 75). After they left, Martin noticed several items missing from his office, including a box that contained original credit card receipts. (*Id.* at ¶ 78-79). Assuming the truth of these allegations, Green Valley did not have a legal right to enter defendants' property. The Contract did not give Green Valley an open-ended legal right to enter 2211 Realty's property at any time without notice for any

purpose. Rather, the Contract required 2211 Realty to *permit* Green Valley to enter the property at any time for the limited purpose of "inspect[ing] the Station," and "inspect[ing the] books and records." This language, at the very least, indicates that 2211 Realty's obligation will be triggered after Green Valley request permission—presumably, a reasonable request—to inspect the station and the books and records.

The Court need not interpret the precise meaning of the Contract at this early stage of the litigation, it is enough to say that the Contract clearly does not allow Green Valley to enter the property without permission and take 2211 Realty's business records. The motion to dismiss as to Count 4 will therefore be denied.

### E. Rhode Island General Laws § 9-1-2 (Count 5)

The counterclaim alleges that Green Valley's actions constitute the commission of a "crime or offense," and therefore defendants may recover damages pursuant to Rhode Island Gen. Laws § 9-1-2. Section 9-1-2 states:

> Whenever any person shall suffer any injury to his or her person, reputation, or estate by reason of the commission of any crime or offense, he or she may recover his or her damages for the injury in a civil action against the offender, and it shall not be any defense to such action that no criminal complaint for the crime or offense has been made; and whenever any person shall be guilty of larceny, he or she shall be liable to the owner of the money or articles taken for twice the value thereof, unless the money or articles are restored, and for the value thereof in case of restoration.

R.I. Gen. Laws § 9-1-2. "Under Section 9-1-2, a [claimant] may bring a cause of action even if no criminal complaint for the crime or offense has been filed." *Gray v. Derderian*, 400 F. Supp. 2d 415, 430 (D.R.I. 2005) (citing *Mello v. Dalomba*, 798 A.2d 405, 411 (R.I. 2002)). To obtain civil remedies under the statute, a claimant need only prove criminal liability by a preponderance of the evidence. *Cady v. IMC Mortg. Co.*, 862 A.2d 202, 215 (R.I. 2004). Although "[i]t is not

13

necessary for the [claimant] to allege the commission of the crime, which is the basis of his claim for damages, with the technical accuracy required in the criminal complaint[,] . . . it must be described sufficiently for identification." *Williams v. Smith*, 68 A. 306, 308-309 (R.I. 1907).

Here, the counterclaim does not identify or otherwise describe which crime or crimes are the basis for liability. Count 5 simply alleges that "[b]y their actions, Counterclaim Defendants have engaged in criminal conduct." (Countercl. ¶ 116). This does not sufficiently describe what conduct defendants allege was criminal such that plaintiffs could identify the crime that is the basis for a claim for damages. *Williams*, 68 A. at 308-309; *cf. W. Reserve Life Assur. Co. v. Caramadre*, 2012 WL 399184, at *12-*13 (D.R.I. Feb. 7, 2012) (denying motion to dismiss and allowing plaintiffs to "revive" cause of action under § 9-1-2 where plaintiffs amended complaint to allege a different crime as basis for claim for damages).[9] Accordingly, the motion to dismiss as to Count 5 will be granted.

### F. Rhode Island General Law § 5-55-4 (Count 6)

The counterclaim further alleges that Green Valley violated defendants' rights under Rhode Island General Laws § 5-55-4(d)(2) by not giving them 120 days' notice prior to terminating the Contract. Section 5-55-4(d)(2) applies where the asserted cause for terminating the franchise agreement "is among those specified in subdivision (c)(1) . . . ." Subdivision (c)(1) allows a franchisor to terminate a franchise agreement if: (1) under the franchise agreement, the franchisor leases real property and improvements to the franchisee, and (2) there is a lawful

---

[9] In their memorandum in opposition to plaintiffs' motion to dismiss, defendants allege that plaintiffs' conduct violates R.I. Gen. Laws § 11-44-1 (obstruction of lawful pursuits) and R.I. Gen. Laws § 11-41-4 (obtaining property by false pretenses or personation). However, the counterclaim does not articulate claims for relief based on either of these crimes, or indeed any crime. *See Western Reserve Life Assur. Co. of Ohio v. Conreal LLC*, 715 F. Supp. 2d 270, 287 n.16 (D.R.I. 2010).

termination of that lease under which the franchisor is entitled to possession of the real property and improvements.[10]

Defendants contend that the Equipment Loan Agreement—through which Getty loaned 2211 Realty the equipment necessary to store, handle, and dispense Getty's products—is a lease of improvements to real property, and therefore they were entitled to 120 days' notice before termination of the Dealer Commission Contract. (*See* Countercl. Ex. A, at 12, ¶ 1). However, even assuming the Equipment Loan Agreement was a lease of an improvement of real property, it is unclear why subdivision (c)(1) applies. Based on the pleadings and attached exhibits, it appears that Green Valley asserted that it was terminating the franchise agreement because "2211 Realty is in material default under the Agreements." (Countercl. Ex. I).[11] Thus, it appears that plaintiffs were required to comply with the notice requirement of § 5-55-4(d)(1), which applies when "the asserted cause [for terminating the franchise agreement] is substantial noncompliance with the obligations of the franchise agreement." R.I. Gen. Laws § 5-55-4(d)(1).[12]

---

[10] Specifically, subdivision (c)(1) provides:

With respect to franchise agreements where the franchisor leases real property and improvements to the franchisee, the agreement may be terminated; provided, that there is a lawful termination of lease, license, or other non-ownership under which the franchisor shall be entitled to possession or control of that real property and improvements.

[11] Specifically, Green Valley asserted that 2211 Realty had materially defaulted "pursuant to the terms of the Dealer Commission Contract, at least in the following respects: failure to remit funds from sales of gasoline and failure to maintain and provide proper records and receipts in breach of Sections 6, 26, 27 and 28," and "these defaults entitle GVO to terminate that agreement." (Countercl. Ex. I). Green Valley then gave notice that "the remaining Agreements are also terminated pursuant to their terms and upon such notice as may be required therein." (Countercl. Ex. I). According to the terms of the Equipment Loan Agreement, "in the event . . . the Supply or Commission Contract between Company and Operator is terminated, Company may forthwith, without notice, terminate this agreement, and in any manner take possession of the Equipment." (Countercl. Ex. A, at 12, ¶ 6).

[12] Section 5-55-4(d)(1) states:

[The] franchisor shall give the franchisee seven (7) days from receipt of notice in which to correct any breach. If the breach has not been corrected within the seven (7) day period, the franchisor

It is not clear to the Court why the notice requirements of § 5-55-4(d)(2) apply. Most significantly, it is unclear whether Green Valley asserted it was terminating the Contract for a reason specified in subdivision (c)(1), and whether the Equipment Loan Agreement constituted a lease of "real property and improvements."[13] At a minimum, further factual development is needed to resolve these issues. Under the circumstances, the motion to dismiss as to Count 6 will be denied.

## IV. Conclusion

For the foregoing reasons, plaintiffs' motion to dismiss the counterclaim is STAYED as to the claims against Getty. As to the claims against Green Valley, the motion is GRANTED as to Count 5 and DENIED as to Counts 2, 3, 4, and 6.

**So Ordered.**

Dated: February 16, 2012

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

---

may terminate the franchise agreement in accordance with the notice requirements of the franchise agreement.

R.I. Gen. Laws § 5-55-4. Paragraph 29 of the Contract states:

Company may immediately terminate this contract, upon two (2) days written notice to Dealer or such other notice given in accordance with applicable law (or without notice in the event of a misbranding or trademark violation) and in any manner take possession of the equipment and, at its option may suspend deliveries of gasoline or petroleum products during any period of default in the event Dealer does not comply with anyone of the terms and conditions of this contract, or upon any violation of any applicable law, statute, rule or regulation . . . .

(Countercl. Ex. A, at ¶ 29).

[13] Specifically, it is unclear whether the equipment leased through the Equipment Loan Agreement was an improvement to real property, and whether, by referring to "franchise agreements where the franchisor leases real property and improvements," subdivision (c)(1) applies to franchise agreements where there a lease of an improvement to real property, but no lease of real property. These issues would benefit from additional factual development and briefing.